Good morning, and may it please the Court. As we all know, the facts of this case are rather disturbing. Over the course of four days, Jace Coones was effectively cooked alive in a Texas prison, during which the only quote-unquote treatment he received was a short rest on a gurney and a nurse quote-unquote encouraging him to get up off the floor of his cell, which he was attempting to use to cool off and quote, get on with his day. He also lost 24 pounds during that four-day period due to severe dehydration as a result of the extreme heat that he faced. As far back as 1977, this Court has recognized that the Eighth Amendment is implicated by such extreme temperatures, which clearly can cause significant health problems. In our brief, we cited two cases from at least 2004, 2012, 2015, and so on that have found the Eighth Amendment violations against prison officials due to extreme heat conditions in prisons in this circuit. We also noted two other cases in our 28J letter that came out within the last three months that have also confirmed our reasoning with respect to the same line of cases wherein liability can attach under 1983 for extreme heat conditions. Despite this Court's consistent reasoning on these matters and on this subject, the District Court dismissed Ms. Kunz's claims at the pleading stage, which was clearly wrong to do for three reasons. First, the District Court was wrong to find that appellant failed to plead subjective, deliberate indifference with respect to the care-providing appellees, where here, as was the case in Hinojosa, the extreme heat was an open and obvious condition of the prison. And Jace repeatedly complained of classic symptoms of heat-related illness, things like warm skin, dry to the touch, hyperventilation, things like that. And it's unclear what else appellant could have pled that would have shown subjective, deliberate indifference, and Hinojosa makes clear that appellant was not required to plead anymore to show subjective, deliberate indifference. Second, the District Court was wrong to dismiss appellant's supervisory and Monell claims, where appellant clearly pled the knowledge of a longstanding, widespread, and well-publicized problem among heat-related issues and heat-related deaths in Texas prisons, but a stubborn refusal to implement appropriate policies and address these issues, both on a wider level within the TDCJ and in terms of implementation in the Wallace Unit. And third, the District Court was wrong to dismiss plaintiff's ADA claims against the government appellees, where Jace was clearly a qualified individual due to his asthma and his allergies, and his breathing was impaired. So what's your best case on a prisoner being discriminated against for not being able to do what they want to do or need to do? What's your best case on that, that arena? So the ADA claim, just to clarify, Your Honor, is specifically a failure-to-accommodate claim. So we are looking at Smith v. Harris County. Okay, but it's a discrimination that needs to be accommodated. And so what I'm asking is, in this context, what is your best case? The best case I can point to, Your Honor, is Smith v. Harris County, where, you know, we have a qualified individual, we have a known disability in the paperwork and the medical records, and we have a failure to make reasonable accommodations, especially considering the reasonable accommodations that we're talking about. One accommodation he had received previously, just a few weeks before he was sent to the emergency room in emergency conditions, which is what he was facing for an extended period of time with no real treatment. And he was also, he also requested, you know, extra rest time on a gurney, but was forced by security back into his cell and requested a cool shower, but was denied that. But turning to the first point about the medical care appellees and subjective deliberate indifference, Hinojosa made it clear that subjective deliberate indifference, especially the pleading stage, can be found based on circumstantial and obvious facts. Let me ask you, back to the ADA, if everybody in the prison is horrified by the lack of air conditioning, is that a particular discrimination against a particular party, or is it just a bad thing that they're doing? Because for example, in discrimination on gender, if somebody is nasty to all men and women, that's not discrimination on gender, it's just nastiness. So I'm asking that in this capacity. In this capacity, Your Honor, um, the, yes, all prisoners faced the same conditions, um, but not all prisoners have the same vulnerabilities to those conditions. And it's the failure to recognize or do anything differently where prisoners are at particular risks, um, to those conditions. And Hinojosa doesn't touch on it in the ADA context, but it does still deal with the same basic issues where the inmate in that case had diabetes and a number of other conditions that required medications that made him more susceptible to these sorts of issues. Um, and, you know, again, to turn back to the care-providing defendants, um, appellant pled not only that, you know, there were the two specific instances, um, with Christy Baker and, uh, with Nurse Coons that specifically saw him, that there were numerous instances over the course of the time period at issue where he presented to the medical unit, um, to, uh, at different points, all of the, the individual medical-providing appellees in this case, um, that he was having these heat-related illness problems, um, and that, uh, you know, if at the beginning of this four days he was hyperventilating, didn't have enough water to produce sweat, um, and warmed to the touch, that that would only have increased over the course of four days, which we can see, um, when Nurse Baker did see him lying on the floor 24 hours before he was found dead, uh, nonverbal and having not eaten at least the last four meals at a minimum, um, and, uh, with respect to the, the other individual appellees, um, we did try to get more records, but those records are, um, you know, set aside under the, the Texas Public Information Act, so there, there's not a lot that we can access that way, so we're, we're reliant on, um, appellees themselves to be able to get those and we were only able to get, you know, a limited number, which shows why, uh, it was too early to dismiss this case, um, so, yeah, with, uh, and with, with that in mind, on the supervisory level, um, we only need to show a substantial risk of serious harm, not even an actual injury, you know, um, and that goes to, um, that goes to Heffner and Collier, and we pled knowledge, specific knowledge on their part of, again, uh, what Hinojosa describes as, um, circumstantial and obvious facts, um, these, these conditions that, you know, Heffner in particular was at that unit while, you know, we're, we're in triple, triple digit temperatures for extended periods of time, the coolest overnight temperature recorded was 79 degrees, um, and yet there was, uh, basically a, a lack of anything meaningful in terms of providing access to remedial measures, both on a level of implementation at the specific Wallace unit and at the, uh, higher level of TDCJ of, um, making sure that these resources are available and have strong procedures for, um, distribution. And, uh, with respect to Monell specifically, um, you know, the, the district court looked a lot at, um, numerosity of past incidences and, and things like that, um, but again, Hinojosa points to the substantial risk of serious harm. Um, and even if we were to look at numerosity on ROA 787 and 88, appellant pled that, you know, the heat, the heat death rate in Texas prisons for a number of years has been over 30 times the national average, that there have been hundreds of deaths over that time that are likely underreported and doesn't include, um, non-death injuries related to heat issues such as brain damage from heat strokes, um, or contemporaneous, um, suffering from the effects of dehydration or heat, uh, stroke and exhaustion. Um, so it's, it's, you know, the, the policies, the policies and the lack of policies in the face of all of this information that, um, has been pled and not only in this case, but has been pled in a number of other cases, um, over the last number of years, um, that Collier and the, the government at police would, were aware of and failed to address in any meaningful way. Um, so, you know, and, and with respect to the, to the ADA claim and, um, the, the sovereign immunity determination below, um, the district court looked to the, the Georgia factors and it's, it's our position that, you know, if, if we have a reasonable accommodation claim due to the fact that he's a qualified individual, um, with a known disability in the medical records and that they failed to make reasonable accommodations combined with the fact that we have a robust 1983 case under this court's clear precedent stretching back decades, um, that those, uh, Georgia factors are clearly met and would overcome the sovereign immunity challenge that the district court had cited below. Um, and in fact, Georgia itself is, is a similar case to the, to the case at Barr where it was, uh, an Eighth Amendment claimant under 1983 that was claiming an ADA violation and, um, Justice Collier writing for the majority held that sovereign immunity was waived in that instance as well. Um, so, yeah, with that, I, I think the last few things I would note barring further questions from the court, um, would be that Hinojosa, Hinojosa in particular, but, you know, we have Gates, we have Smith v. Sullivan, um, there's Bell and Blackman as well, um, that really thoroughly address the issues that, uh, appellant presented in her complaint, um, and between those cases and, you know, the basic prisoner rights, um, of the Eighth Amendment to access medical care and Estelle and, you know, basic prisoner rights to, to decent conditions of, um, that, that don't injure their health purely by being in their cell in, in the same way that that happened to Mr. Coons, um, that, that this is, uh, a clear case under those standards, uh, both with respect to, uh, the individual care providing appellees, the two individual supervisors and, um, the government in Monell. Um, so with that, again, barring any further questions from the court, I'll reserve the rest of my time for rebuttal. Okay. It's your turn. All right. Thank you, sir. Thank you, Your Honor. Mr. Fraser. Good morning, Your Honors, and may it please the court. I represent the state appellees, that is, in addition to the state of Texas and Texas Tech University, Dr. Baker, Nurse Cogburn, and Warden Hefner. Nurse Baker and Nurse Cogburn, who were the subject of . . . Okay. Give us your good theater voice. Sorry? Give us your good theater voice. Am I being too quiet or too loud? Yes, you are. Um . . . A big guy, but you're coming on a little bit. We're moving to the mic trying to hear you. I apologize. No worries. No worries. Um, Nurse Cogburn and Nurse Baker, who were the subject of much of the pleading and briefing this case, are represented by Mr. Carter, who will be arguing right after me. Your Honors, there's no doubt that this is an incredibly tragic case. With respect to my clients, however, the district court's order dismissing the second amended complaint should be affirmed largely on qualified immunity and sovereign immunity. I think the elephant in the room here is that the plaintiff has not made any specific qualified immunity arguments on appeal. If you look at page twenty-eight of the opening brief, she argues only that qualified immunity is a quote, fundamentally flawed doctrine that should no longer exist. She did something similar in the district court. She argued that qualified immunity is a common law doctrine that has outlived its usefulness. Well, as the court is aware, that's really no argument at all. Qualified immunity in its current form has been the law of the land for decades and certainly applies here. Well, we cannot change the U.S. Supreme Court. You all have to go up there for that. Yes, Judge. I think we all understand that. What is your best argument on ADA? I think the best . . . Your best case. I think the best case there is Windsor. I was rereading it this morning, at least with respect to the pleadings. If you look at paragraph sixty-one of the complaint, it basically just says I raise an ADA claim. In Windsor, this court was clear. Mere knowledge of a disability is not enough. There must be a request for an accommodation that is in direct and specific terms. Otherwise, the plaintiff must make a showing that the disability, the resulting limitation and the necessary reasonable accommodation are all open, obvious and transparent. I would just say that on that claim, the pleadings are simply insufficient. There's an allegation that Mr. Coons had allergies and asthma and that prison officials would have been aware of that based on forms. I don't think that meets the pleading standard from Windsor. With respect to the constitutional claims against Dr. Baker and Nurse Hetty, there are certainly no allegations of conduct that was objectively unreasonable in light of clearly established law. Indeed, the second amended complaint contains no specific factual allegations of any conduct of theirs whatsoever. That really leaves just the policy claims against Executive Director Collier and Warden Hefner. There's really two claims there. The first is that there's no HEAP policy and the second is only with respect to Warden Hefner and that's a claim that he failed to implement remedial measures. In response to the first claim, the district court correctly granted judicial notice of the fact that TDCJ does in fact have a HEAP policy, which was reflected in many of the articles cited in the plaintiff's complaint and the plaintiff has nothing to say about that in her opening brief either. That leaves just the failure to implement remedial measures claim against Warden Hefner. The district court sort of generously construed that as a de facto unconstitutional policy claim and then said that under cases like this court's Russell case, the allegations are simply insufficient. Russell was clear that allegations of a de facto unconstitutional policy claim must be very factually specific. They can't be conclusory. If you'll recall in that case, that was a case where a prisoner committed suicide and had presented to prison officials on two occasions with suicidal thoughts and the prison officials didn't put him on suicide watch and the court said two instances of inaction on behalf of prison officials are simply insufficient to establish a de facto claim. Here the district court correctly noted that assuming the allegations in the complaint are correct, the plaintiff has similarly alleged two instances in which Mr. Coons presented to prison officials, again, those weren't my clients, but presented to prison officials with symptoms of heat exhaustion and they didn't do anything. The district court said that is similar to Russell and so there's no de facto unconstitutional policy claim. But I mean, the heat issue wasn't just him. So what is your addressing of that? That you've got this building that's just impossible for anyone to be in? Your Honor, there's no doubt that heat in Texas prisons is an issue. If you look at the order from the Judge Pittman case, the order denying a preliminary injunction, Executive Director Collier himself testified, everybody's aware of the issue. He's doing everything he can. He presented a four-phase plan to the Texas legislature in 2022 asking for more funding. It's difficult. We have done the best that we can. We're at about a third of all Texas TDCJ inmates have access to 24-7 air-conditioned beds. It's not everybody. It's not perfect. It's very expensive to do and we can only do what the legislature funds essentially. And I was just informed by my client yesterday that the legislature did just increase our budget or the TDCJ AC budget by 13% for the next two years. So certainly I acknowledge that the heat issue is an issue for everybody in the unit. But with respect to the constitutional claims against my clients, again, there are no allegations whatsoever against Dr. Baker or Nurse Hetty. The appellant doesn't even mention them by name in the opening brief other than to lump them together with the so-called care-providing appellees, which is a phrase that opposing counsel used several times just now. I would note that that's eight different defendants lumped together against only two of which the plaintiff has made any specific factual allegations. That leaves really just the state law claims and the ADA claims. We'd be happy to stand on our brief on those issues unless the court has any further questions. You're good. Thank you, Your Honors. All right. Thank you. Mr. Carter. Thank you, Your Honor. May it please the court. I'm going to focus my argument primarily on two of my clients, Nurse Cogburn and Nurse Baker. They've both worked in that facility for a long time. I know them individually. I've represented them before. It's a difficult job that they have. They work in the heat also, and it's difficult for them when they get sued. Of course, the facts of this case are difficult, but they do their best to try to take care of these inmates under difficult circumstances. I would piggyback a little bit on the argument of my co-defense counsel about waiver on qualified immunity. I just don't think they addressed it in their brief, so I think that's important. I don't think they've preserved their burden on that at this level. In terms of the other care providers, not Cogburn and Baker, I would just say that I think all the allegations against them are a conclusory. They're done in a collective manner, so I just don't think that they're at all sufficient. I don't even think it's close on them. Well, honing in, you said you have nurses, Cogburn and Baker? Yes, Your Honor. As I understood the complaint, at least relative to them with respect to what you're saying about difficult job, but I guess it's honed in that he complained to them specifically or they were aware he had asthma, and he requested specific relief or whatever, and they declined . . . My hearing is not quite as good as it was, Your Honor. I apologize that I . . . No, no, no. No worries. I tend to do that. I'm just trying to hone in on your two clients and the allegations against them, not the sort of general across-the-board allegations, but specifically, if I understand it here, the allegations that they were made aware, these two nurses . . . That is true, Your Honor. . . . of his asthma, a specific problem he was having or whatever, and he asked for specific help, relief, whatever that would be, not give me air conditioning, but specifically to his ailment, and that that was declined or whatever, whatever, and so putting aside the other things, I guess the question is, at the pleading stage, if that's alleged against him, is that enough to dismiss them out of the case without more, not saying whether he could ultimately prevail on it or whatever, but that is less of a general complaint, more of a specific, they knew I had asthma, under these conditions, I was suffering, I asked for relief, they didn't give it to me, etc., etc. So, I'm just asking to hone in kind of on that part, particularly at this stage of the proceeding. Yes, Your Honor. So, with regard to . . . well, first of all, the part of what they have to plead is that they had actual knowledge of a serious health condition, and that can be inferred, but this court has said that that can only be inferred under exceptional circumstances where the risk of harm is obvious. That's partly from Thompson v. TDCJ, which is a 2023 case from this court. Gobert v. Caldwell, which is a 2202 case, said that a serious medical condition is only there when it's so apparent that even a lay person would realize that care is needed. So, with regard to Nurse Cogburn, she saw Mr. Coons one time, according to the pleadings. There's no indication that she saw him more than one time. He walked into the medical unit, so he walked in, he talked to her, and what he said to her was, I'm hot in my cell, I'd like to be moved to another cell, and I'd like to take a shower. So, he made no request for medical care. He made no statements about his medical condition, according to the pleadings. She took his vitals, she assessed his skin, and she let him rest on a cot. We don't know how long, it's unspecified, but then at some point he was made to go back to his cell. There's no indication that he couldn't get up and walk himself back to his cell. She had a security guard come and make him go back, but he was walking, he was talking, he was lucid enough to make complaints about the heat, so I just don't think there's anything there that would show that she actually had subjective knowledge that he had a serious medical condition at the time. Well, but with Baker, that's not true. Say that again, Your Honor? With Baker, the nurse Baker, that's not true. Well, let's talk about nurse Baker. I mean, he's lying there naked and dying, and she just walks by and says, ah, go get up. Why is that appropriate? The allegation that he was dying is a conclusory. He died 24 hours, he was found 24 hours later. Well, he was found 24 hours, but he died before that. And just walking by and saying, oh, get up, why is that appropriate at this level, not necessarily at trial or whatever, but at this point? Okay. She, I think her documentation, which is quoted verbatim in the pleadings, they have the medical records because they quoted verbatim from him in the pleadings. And what she stated in her medical records was he was moving, he was rolling around on the floor naked. I don't know how unusual that is in a TDCJ unit, but he's in his prison cell and he's got his clothes off and he's rolling around, so he's moving. He, when he, when she talked to him, he responded, not verbally, but she said he responded. She also noted in her records that he did not appear to be in pain and he had no respiratory distress. So her, that makes it clear, that's from their pleadings. That makes it clear that her subjective knowledge was that he did not have a serious health condition. Maybe she was wrong, so I'll refer this court to its opinion in Thompson v. TDCJ, where an inmate was seen by nurses on a number of occasions and the symptoms he had were, that's a 2023 case, he was having difficulty swallowing, his face was starting to stiffen, he was experiencing weakness, mental impairment. His sister called up there and told them about the problems during this time and then it turned out that he had a brain stem stroke. That was dismissed by the trial court at the pleading stage. Comes up to this court and the court upheld that dismissal saying that, well, maybe the nurses should have known from those conditions that he was going to have a stroke, but they missed it. And what the court said was, maybe that's medical negligence, but it's not deliberate indifference. And it's not at the level of where no reasonable person could have taken the same action. And that's the final prong of qualified immunity is objective unreasonableness. And I don't think there's sufficient pleadings here to show that no other nurse under those circumstances could have taken the same action that Nurse Baker did. Because obviously, she did not think that he had a serious medical condition. Because he was moving, he responded, he was breathing just fine according to her notes that were written in the pleadings. But her saying he responded... I'm sorry, Your Honor? Her saying he responded, he didn't talk. So the fact that he's just swirling, I mean, that doesn't necessarily mean anything good. Well, she said he responded to verbal stimuli, which I assume he went something like that. You know, I do that myself some of the time. I get in trouble at home when I just do that. My wife says we'll talk. But she did say that he did respond to verbal stimuli. So he wasn't conscious. He wasn't vomiting. There's a case, Austin v. Johnson, which involved heat stroke, where in that case, the deceased had been vomiting, had been unconscious for two hours before medical care was called. I think that is distinguished here from Thompson v. TDCJ. Those are the kind of allegations, I think, that are necessary to show that level of deliberate indifference. In other words, knowing that there was a serious medical condition and being indifferent to it. I don't think that those facts have been pled in our case like they were in this Austin v. Johnson case and like they were not in the Thompson v. TDCJ case. I see that my time has expired. I'm happy to answer any other questions that the Court might have. Thank you. All right. Thank you. May it please the Court. I'm here on behalf of Mitchell County, Texas. The Court should affirm the dismissal as to Mitchell County because there are no allegations in the petition, the complaint, or in the briefing related to Mitchell County related to this case. The only thing Mitchell County has in common with this case is the fact that the Wallace Unit is located in Mitchell County. There was no allegation made in the complaint that Mr. Coons was ever in the custody of Mitchell County. There is no allegation of any employees of Mitchell County being involved in the medical care or other decisions made related to Mr. Coons. For that reason, it's a very simple argument. There's no allegations made and therefore the Court should just affirm the decision. I'll be happy to answer any questions related to that. That's all I have. All right. Thank you, sir. All right. Back to you, Mr. Johnson. Okay. What's your best response to what he said about the nurse baker? With respect to nurse baker, several things. The first is just to point out that, you know, there were a lot of assumptions of facts in nurse baker's favor on that. But like Your Honor was pointing out, and as opposing counsel himself pointed out, you know, we're looking for whether the risk of harm is obvious that a lay person would recognize. And your questions, Your Honor, about, but he's lying on the floor, you know, responded non-verbally, what does that even mean? I think we're really pertinent and show the fact that this is clearly a person in distress that anybody would have recognized was in distress and in some level of emergency. And not to mention the fact that when she did see him, not only was he rolling around on the floor naked and not able to verbalize, there were also four uneaten meals around him. Again, another very obvious fact from which any lay person, let alone a medical professional, would draw conclusions that this is a person in distress. And I think too that the same argument in terms of the risk of harm being obvious and lay people being able to recognize it also applies to Cogburn, who... Yeah, now, did she not know anything about him? She just had him come and he said he wanted X, Y, Z and she helped him a little and then she forced him back out and that was the end of it? No other knowledge? Yeah, that's what's in the pleadings, but we also pled that there are other visits to the medical unit that we knew took place, but we don't have any of the details about them. So we don't know whether Cogburn saw him on other occasions or anything like that, but the one where we did have some level of facts about it is that he presented, she even said, it was normal for anybody, but also didn't comport with his own previous readings when he'd previously reported to the medical unit. And his respiration was in the 90s, which is a level of pretty obvious hyperventilation. And in terms of lay people being able to recognize an illness, obviously we're in New Orleans, we're talking about a Texas prison. Even myself, I grew up in Southern California. I did a lot of stuff outside. It was something that myself and other people I knew that were engaged in the same activities. We knew that if somebody is so warm that they're not sweating, that they're dehydrated. We know that if somebody's skin is red and warm to the touch, that they're at least at a state of heat exhaustion and need to be set to shade, cool off, sip on some water. It's just this basic stuff of living someplace where it's hot. I knew that growing up. I didn't have any formalized medical training at that time, nor did my parents. So this is obvious stuff that we would expect better from medical professionals. And to that end, again, as frustrating as it is in terms of having individual care providers that we don't know much about, we have to include them in our complaint in order to preserve the issues and preserve our timing and statute of limitations on them. But we have, again, we can't get the public records requests on them, and they're in control of any of the records on all that. And I'd also like to address real quick the idea of waiving a qualified immunity argument, which frankly I don't understand because on pages 19, 20, and 25 at a minimum, and that clearly established case law in Hinojosa, in Estelle, in the Farmer case as well, in addition to the cases cited throughout, and pointed out very explicitly that these are clearly established laws that would overcome qualified immunity. So that's not an argument that we waived. And in turning finally to the state's argument, the state's argument is that the state's opposing counsel noted that Collier himself, you know, addressed that these issues, or acknowledged that these issues were problems in 2022. But that was after this case. You know, this is something that's been known about for an extremely long time, and it's been since 2022, and we haven't had significant movement, and there was a significant movement before that, despite the fact that these were known issues. This is not a case, you know, there was sort of the understanding that, you know, this is tragic, but there's nothing we can do. This is not the sort of case that the Fifth Circuit has found that to be true for. This Court has found for these sorts of cases in the past and should do so again. So with that, we ask the Court to reverse and remand. Thank you. All right. Thank you, counsel, both sides. This concludes the early argued cases for this panel. The panel will stand in adjournment.